No. 2638.

JOE AND JOHNSON HEARD v. THE STATE.

1. MURDER—CHARGE OF THE COURT.—The correctness of a charge of the
   court is to be tested by its sufficiency as a whole.  Murder of the first
   degree was the only grade of homicide presented by the evidence in this
   case.  It was objected that the charge, in applying the law of express
   malice to the facts in proof, was too general as to the design to kill,
   inasmuch as it did not limit it to the particular design to kill the
   deceased.  *Held*, that, in view of the charge as a whole, the objection
   was hypercritical.
2. SAME—CIRCUMSTANTIAL EVIDENCE.—It is only when the inculpatory
   proof is wholly circumstantial that the trial court is required to charge
   the law of circumstantial evidence.
3. SAME—FACT CASE.—See the statement of the case for evidence *held*
   sufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Harrison.   Tried below
before the Hon. J. G. Hazlewood.

   The appellants in this case were convicted of murder in the first
degree, and awarded a life term in the penitentiary, under an
indictment which charged them jointly with the murder of A.
H. Kinney, in Harrison county, Texas, on the twenty-sixth day
of August, 1886.

   Joseph Scott was the first witness for the State.   He testified,
in substance, that, on the twenty-sixth day of August, 1886, he
found the dead body of A. H. Kinney lying between the rails on
the track of the Texas & Pacific Railway.   When he found the
body, the witness was on a hand car, going to the town of Long-
view.   Felix Turner, who was with the witness, remained with

the body, and witness went on to Longview to notify the coroner of the discovery. Witness found the body at a point about two and a quarter miles east from Longview, and about one and three-quarter miles from the deceased's house. The discovery was made about half past six o'clock in the morning. The deceased, on the evening before, at about six o'clock, rode with the witness on his hand car from Longview. A few minutes after Kinney got on witness's car, on that evening, the witness stopped the car on a curve of the road to listen for an incoming train, and, while so stopped, one Jim Bell came to the track near the car from the woods. The witness observed, when he found the body, that the back of the head had been cut by a passing train. A leather grip sack was about the neck of the body.

Felix Turner testified, for the State, that he was with Joseph Scott when the body of Kinney was discovered on the railway track, and he was left by Scott to guard the body. Witness went to the house of Dorcas Kinney, the wife of deceased, and reported the discovery of Kinney's dead body. The defendant Johnson Heard was there. He and his co-defendant, Joe Heard, were sons of Dorcas Kinney by her former husband. Johnson lived with Kinney and his mother then, and had lived with them for a year past. Dorcas Kinney manifested great grief when told that her husband was dead, and that his body was then lying on the railway track in the "cut." Johnson Heard, on being told of the finding of the body, said: "I told you he was dead; I will get a wagon from Mr. Harris to move him." Johnson then went off, and soon came to the body in a wagon, Mr. Harris coming with him, riding a mule. Harris and Johnson went to Longview, and in the evening returned to the body with a coffin. When Mr. Harris first reached the body, he turned it over and said: "Why, he is shot; we must get a coroner." Kinney's body was taken to the house of a woman who lived near the cut where the body was found, and was there prepared for burial. When Johnson came with the wagon to the body, before going to Longview for the coffin, he drove past the body before stopping. Witness, who was with the body, could not be seen from the road. Johnson Heard was present at the inquest over the body.

Sam Huffman testified, for the State, that he saw the dead body of Kinney on the railway track on the morning of its discovery. He counted eleven small buck shot holes in the back. An old satchel, containing two bottles of whisky and

some small pistol cartridges, was on the body. Witness had no recollection of seeing Johnson Heard at the inquest over the body. He had never heard either of the defendants utter any threats against the deceased. Witness remembered the trial of one Jim Bell for shooting into the house of Dorcas Kinney after the death of A. H. Kinney. The witness was a witness on that trial, and returned home from Marshall on the same train with Jim Bell, and with the defendants and other witnesses. The party got off the train at Lansing Switch, and a row between defendants and Bell occurred. Witness heard the quarreling, but did not hear either of the defendants say that they put twelve buck shot through Kinney, and would do the same to Bell.

Thomas Griffin testified, for the State, that he saw the body of the deceased on the morning that it was found. He saw twelve buck shot holes in the breast. At about eight o'clock a. m. witness went from the body to the house of Dorcas Kinney, and there found Mr. Phillips and the defendant, Johnson Heard. At that time witness saw a gun on the gallery, standing against the wall. Mr. Phillips took up the gun and looked at it. When he replaced it, the witness examined it, placing one of his fingers in one of the barrels. When he withdrew his finger he found it powder moist. About two months after the killing of Kinney, at which time he, witness, was standing on Jim Bell's premises, about fifty yards from the railroad track, he saw both of the defendants walking the railroad track, going towards Longview. When about opposite Bell's place, Johnson Heard, speaking in a loud tone of voice, said: "I put twelve buck shot through Kinney, and there are two more I want to put them through, and I don't care what the hell then happens." Witness testified on the trial of Jim Bell for shooting through Dorcas Kinney's house. The parties to the trial and the witnesses boarded the same train after the trial was over. The parties all got off the train at Lansing Switch. As witness left the switch, he heard Joe Heard, who was quarrelling with Bell, say: "I put twelve buck shot through Kinney, and will put them through you." Old man Tucker, Buck Tucker, Reel, Flowers, Huffman and Nick Harris were present. Jim Bell did not go to the house where Kinney's body was prepared for burial, but told witness to go and help, and that he would pay witness for the time lost by witness.

On his cross examination, this witness said that he lived on

Jim Bell's place when Kinney was killed. Johnson Heard spoke very loud when, walking on the track, he said that he put twelve buck shot through Kinney, etc. Jim Bell and his wife heard Johnson make the statement. Witness heard Bell and his wife afterwards discussing Johnson's statement. The witness would not swear that the gun he saw on Dorcas Kinney's gallery had been recently discharged, but the muzzle of the barrel into which he thrust his finger was smutty. In reply to a direct question, the witness stated that Johnson's words on the track were: "I put twelve buck shot through one son of a b—h. There are two more I want to get, and then I don't care what in the hell happens." He was required to repeat Johnson's words, and said that they were: "I put twelve buck shot through Kinney, and there are two more I want to put then through, and then I don't care what they do with me." Witness did not hear Joe Heard say anything at that time. Witness did not know who owned the gun he saw on Dorcas Kinney's gallery. Johnson Heard aided in preparing the body of Kinney for burial, and attended the funeral.

Justice of the Peace C. B. Dickard testified, for the State, that about two weeks before his death, the deceased appeared before him and made a criminal complaint against the defendant Joe Heard. Witness issued a warrant upon the said complaint, and placed it in the hands of an officer.

W. H. Tucker testified, for the State, that, subsequent to the death of Kinney, he attended the trial of Bell for shooting into the house of Dorcas Kinney. Bell, the defendants, witness and other persons, who attended the trial, returned from Marshall, where the trial was had, on the same train. They got off the train at Lansing Switch. The defendants got into a quarrel with Bell, and said that they would eat Bell up. Joe Heard said to Bell: "I put twelve buckshot through Kinney, and I will do you the same way!" Johnson Heard immediately said: "Yes we did." Joe Heard was then armed with a knife, and Johnson with a bar of iron. Huffman got between Bell and the Heards, to part them. The defendants cursed the parties present as "d—d white sons of b——h's." James Green, Joe Harper, Dick McLendon, Lane Huffman and Bob Reel were present, and could have heard what the defendants said. Joe Heard provoked the quarrel with Bell. Witness and Johnson Heard once had trouble. Witness was summoned by an officer to aid in the arrest of the said Johnson. Johnson ran, and fired a pistol at the of-

ficer. Witness followed Johnson, and fired two shots at him as he was escaping over a fence. One of the shots took effect in Johnson's arm. The witness denied that he had ever told N. J. Harris, at Lansing Switch, or elsewhere, that he knew nothing about this case.

Bob Reel testified, for the State, that he was present at Lansing Switch on the occasion referred to by the witness Tucker, and heard Joe Heard make the statement testified to by Tucker.

Lou Russell testified, for the State, that, on one Sunday morning, in the year preceeding Kinney's death, the defendant Johnson Heard came to her house, and she asked him how his mother was getting along with her new husband,—referring to deceased. Johnson replied that either he or Kinney would have to leave the place, or one or the other would be killed. Witness's brother was now in the penitentiary for the murder of the father of the defendants, the first husband of Dorcas Kinney. The State closed.

W. B. Heard, the first witness for the defense, testified that, some time during the year 1886, he hired the defendant Joe Heard to work for him. He never hired Joe but the one time, and then only for a day and a half.

Charles Sanford testified, for the defense, in substance, that in August, 1886, he was in the employ of W. B. Heard, in Marshall, driving W. B. Heard's team. Late in that month he was taken sick, and told W. B. Heard where he could find Joe Heard, so as to get him to drive his wagon during witness's illness. Mr. Heard got Joe, and Joe drove the team two days and a half. Joe Heard was in Marshall for two weeks during the month of August, 1886.

N. J. Harris testified, for the defense, that he saw the body of the deceased on the morning after the killing. Johnson Heard came to witness's house on that morning, reported the killing of Kinney and borrowed witness's wagon to remove the body. Johnson drove the wagon to a point near where the body was lying under some brush. When witness first saw the body it was lying face downwards. He turned the body over, and discovered gun shot wounds in the back. Witness then informed those present that the body could not be removed until an inquest was held. The witness and defendant Johnson then went in the wagon to Longview, got a coffin and returned to the body about four o'clock p. m. On the return of the witness and Johnson, the body was taken to a house near by, washed and prepared for

burial. Whenever the defendant, Joe Heard, was in the neighborhood, he stayed at the house of his mother, Dorcas Kinney, which was on the witness's place. Witness never heard of any difficulty between deceased and Joe Heard, further than the statement of some one, that deceased once filed an affidavit against Joe for some misdemeanor. Witness was present at Lansing Switch on the occasion testified to by witnesses for the State, but heard nothing of the statements of defendants as testified by said witnesses. He heard Joe Heard say: "I am no son of a b——h." Witness then called to defendants to have no row, but to go home. Tucker once told witness that he knew nothing about this case. Witness signed the bonds of the defendants after their indictment in this case. The witness was at the house of Dorcas Kinney on the morning of, and after, the killing of Kinney. He then saw an old gun, which he knew to belong to deceased, leaning against the wall on the gallery. Witness saw the said gun in the same place about two weeks before. He knew the gun well. One barrel could not be discharged, and the other could be discharged only by snapping it several times.

C. Fields testified, for the defense, that she reached the house of Dorcas Kinney about sun set on the evening of the day on the night of which A. H. Kinney was said to have been killed, and remained throughout that night. Johnson Heard, Haywood Heard and Louis Heard came in from work a few minutes after witness reached the house. Haywood told his mother that his stepfather, the deceased, had gone to Longview to get some whisky with which to make bitters to give his children to break the chills, from which they were suffering. Mrs. Kinney delayed supper until between nine and ten o'clock, awaiting the return of her husband. Haywood and Louis then complained of hunger, and Mrs. Kinney told them to eat their supper, but not to "mess" the things, as Kinney would have to eat on his return. Mrs. Kinney became very excited and uneasy about her husband as the night advanced, and walked the floor in great distress, calling for her husband. Johnson Heard, after eating his supper, lay down on the gallery with his brothers Haywood and Louis, and went to sleep. Witness was kept awake pretty much throughout the night with the tooth ache, and at different times was on the gallery and out in the yard. She knew as a fact that Johnson Heard did not leave his pallet at any time during the night of August 26, and she saw him next day when he got up, about sun rise, which was about the time witness left the house,

resuming her journey to Longview.   The witness was in no way related to the Kinneys nor the Heards.   Mrs. Kinney did not go to bed at all on the night of August 26, but walked the floor, gallery and yard all night, in evident alarm about her husband.

Dorcas Kinney, the wife of the deceased and the mother of the defendants by a former husband, was the next witness for the defense.   She testified that the defendant Joe Heard was twenty years old, and that the defendant Johnson Heard was eighteen years old.   They were both small boys when witness had her land law suit with Jim Bell, in which suit Bell prevailed because the land involved was a part of his homestead property, and because his wife did not sign the deed to witness.   Witness was at home on the night before Kinney's body was found.   She testified substantially to the facts testified to by the witness Fields, locating Johnson Heard at her house throughout that night.   She stated that the absence of her husband, so unusual—he having but twice absented himself at night since their marriage— alarmed her very much, and kept her awake and up all night. She and Kinney lived happily together, and the relations between deceased and the defendants was cordial and friendly.   Deceased once filed a complaint against Joe Heard, but apologized for it afterwards, and explained to Joe that he filed it under a mis- apprehension of facts.   Reconciliation between deceased and Joe Heard resulted from the apology.   Joe Heard left the neigh- borhood about three weeks before the killing of Kinney, and did not return until the Saturday after the killing.   Witness knew nothing of the death of her husband until on the morning after it occurred, when some one came to the house and reported it. Johnson then took witness to a neighbor's house, and went to Mr. Harris's to get a wagon to remove the body.

Haywood Heard testified, for the defense, that the defendant Johnson Heard slept with him throughout the night of the murder, and did not leave the pallet on that night.   He declared that there was no gun standing on Dorcas Kinney's gallery on the morning after the body was found.   The deceased's old gun was then in Dorcas Kinney's room, where it had been for two weeks.   C. Fields came to Dorcas's house on the night of the killing, was there on the next morning when the death of Kin- ney was reported, and remained there throughout the day.

Annie Austin testified, for the defense, that Joe Heard was in the city of Marshall during the month of August, 1886.   He stayed at the witness's house, and had been there several weeks

at the time of A. H. Kinney's death. Witness heard of the killing on the Saturday after it happened. Kinney was said to have been killed on Thursday night. Joe Heard went to work for Mr. W. B. Heard on the preceeding Tuesday, and worked continuously for him until the succeeding Friday at noon. Joe Heard was at the witness's house in Marshall throughout the night of the murder, and did not leave it at any time during that night. Witness testified against Bell on his trial for shooting through Dorcas Kinney's house. She was in no way related to defendants.

Sid Curtis testified, for the defense, that he was deputy sheriff of Harrison county. The cut on the railroad track where the body of the deceased was found was about twenty miles from the city of Marshall.

Amos Gibbons testified, for the defense, that, during the previous term of the district court of Harrison county, Jim Bell offered to pay him twenty-five dollars to swear that he heard the defendants say that they killed Kinney, which offer the witness declined. The defense closed.

Jim Bell testified, for the State, in rebuttal, that, shortly before the body of Kinney was found on the railroad track, he was passing the house of the deceased, and heard deceased and his wife quarreling about deceased coming home drunk. Deceased applied a vile epithet to his wife, when the defendants interfered, and told deceased that they would give him until August 26 to get out of the country. Witness employed counsel to prosscute the defendants because he learned that the defense would attempt to fasten the murder upon him. Witness denied that he ever offered Amos Gibbons twenty-five dollars or any other sum to testify that he heard the defendants declare that they killed the deceased.

Ellen Nunnelly testified, for the State, in rebuttal, that she was in Marshall during the time that Joe Heard stayed at the house of Annie Austin. Witness heard of Kinney's death on the Saturday after it occurred, which was on the preceding Thursday. At about nine o'clock on that Saturday night witness heard Joe Heard tell Annie Austin goodbye, and saw him leave Annie's house with his coat on his arm, and go towards the depot. About five o'clock on the next morning he passed witness's house going towards the house of Annie Austin.

The motion for new trial set up the grounds discussed in the opinion.

*Alex. Pope* and *W. H. Pope,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   This appeal is from a conviction of both appellants for the murder of A. H. Kinney, their step-father, the verdict and judgment being for murder of the first degree, with punishment in the penitentiary for life.

But one bill of exceptions was saved at the trial, and that was as to the sufficiency of the charge of the court to the jury. Murder of the first degree was the only grade of the crime called for by the facts and submitted by the court.   No special instructions were requested by defendants.

The objection urged to the definition, or, rather, to the application of the law of express malice, in that it is general as to "the design to kill," and does not limit it to a particular design to kill the deceased, is, we think, hypercritical.   A charge should be considered as a whole, in judging of its sufficiency.   Taken as a whole, this charge is sufficient, especially in the absence of special instructions amplifying it if so desired.   No one could have possibly been misled as to the party against whom the design to kill must have been entertained, in order, under the charge, to warrant a finding of express malice.   By terms before used, it was declared and thoroughly understood that defendants were on trial for the murder of Kinney and no one else.

Again, it is objected that the court did not submit the law of circumstantial evidence.   This was not a case of circumstantial evidence.   If the State's witnesses are to be believed, statements and declarations amounting to direct confessions of guilt were made on two separate and distinct occasions by one or both defendants—at all events when both were present; and the same thing is shown to have been stated by each of the accused.   If the witnesses were credible and these admissions believed, then defendants are each positively condemned out of his own mouth. It was for the jury below to pass upon the credibility of the witnesses.   They have done so, and by their verdict they avouch the truth of their testimony.   If this testimony is true, then it is sufficient to sustain the verdict and judgment.

No reversible error has been manifested on this appeal, and the judgment of the lower court is therefore affirmed.

*Affirmed.*